IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | PLAINTIFF |
| V. | CAUSE NO. 3:19-CR-50-CWR-FKB |
| OKANLAWAN O. NORBERT | DEFENDANT |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Okanlawan Norbert's Motion to Suppress. The Court has reviewed the testimony and evidence presented at the suppression hearing and received arguments of counsel. For the reasons stated below, Norbert's Motion is granted.

**FACTS**

On the morning of November 29, 2017, Investigator Felix McClinton, a law enforcement officer with the Hinds County Sheriff's Office, received a telephone complaint from an anonymous woman who said she was in management at the Millsaps Apartments, an apartment complex located at 333 Millsaps Avenue in Jackson, Mississippi. The caller stated that illicit narcotics were being sold in the parking lot of the Millsaps Apartments. She described the suspected narcotics dealer as "a black male, dark skinned, slender build with gold teeth known as 'N.O.'" and said he drove a black Infiniti with a tag reading "HVK225." Docket No. 27-1 at 6. The complainant told him that the alleged drug dealing was a "personal safety issue" and that "the residents of the apartment complex were in fear of coming and going." Excerpt from Suppression Hearing Transcript 9, Oct. 7, 2019. The complainant said she called the Hinds County Sheriff Office after calling other agencies had been unfruitful.

Investigator McClinton found the complainant to be credible based on his training and experience. Around 6:00 PM, he met with deputies of the Hinds County Sheriff's Office "Street Crimes Task Force." The morning telephone complaint was the only item on the agenda.

Around 8:00 PM, Investigator McClinton and six to seven deputies traveled to the Millsaps Apartments to investigate the complaint. The deputies were all in uniform or other clothing that marked them as law enforcement.

Upon arrival, Investigator McClinton saw "three to four individuals standing in the parking lot of the apartment complex standing next to some vehicles." Hr'g Tr. at 9. He also saw a vehicle and an individual with characteristics matching the description provided by the telephone complainant. Investigator McClinton "did not see any drug transactions taking place." Hr'g Tr. at 10.

Investigator Kevin Lavine was also on the scene. He saw a black Infiniti and several black men standing in the parking lot speaking to a man sitting in a pickup truck. Investigator Lavine was unable to say if any of the men matched the description of the person described in the complaint. Defendant Norbert Okanlawan was originally not with the group of men, but came toward the group, "walking out of a courtyard area." Hr'g Tr. at 36.

After the deputies got out of their cars, they approached the group and introduced themselves. They stated that they were there in reference to a complaint of drug activity at the apartment complex. The deputies asked if any of the men lived at the property. Testimony at the evidentiary hearing conflicts here. Investigator McClinton testified that no one responded that they lived there, *see* Hr'g Tr. at 10, while Investigator Lavine said one of the men claimed his father was employed at the Millsaps Apartments as a maintenance worker and that he was staying in a vacant apartment, Hr'g Tr. at 35.

According to the deputies, all of the men were patted down for officer safety. The men identified themselves and were checked for warrants by the Hinds County dispatch. During the pat down, one person – not Defendant Norbert – was found to have a plastic bag that had smaller plastic bags of marijuana. The person was arrested and field released to address the charges with the Hinds County Justice Court.

After the pat down, the deputies kept some of the men in one area – purportedly for officer safety. Others were questioned, including Norbert. Both Investigator McClinton and Investigator Lavine state they began to speak with Norbert, with different recollection of the events.

Investigator McClinton says he spoke with Norbert before approaching the black Infiniti. The tone on both sides was calm. Norbert identified the black Infiniti as his vehicle. Investigator McClinton testified that not long after Norbert identified the car, Investigator McClinton walked over to it. The car was 15- to 20-feet away from the group. Investigator McClinton further testified that:

> Initially when I made contact with the vehicle, I ran the tag. I went around to get the tag information on it to check to see if it was stolen. While I'm in the process of doing that as I walk back to the driver's door, I look through the glass, and I can see a pistol laying on the floor in plain view.

Hr'g Tr. at 14. Investigator McClinton says he walked back over to Norbert, spoke with him briefly, then walked to the Infiniti with Norbert. Investigator McClinton then opened the door to the car, which was unlocked, reached in, and retrieved the gun. Investigator McClinton states that this was done for officer safety. Investigator McClinton testified that he did not remember whether Norbert gave him consent to enter the car.

Investigator McClinton testified that he complimented Norbert on the gun. Eventually, during their verbal back and forth, Norbert stated that it was his gun. Norbert also said that he

3

had a felony burglary conviction. Investigator McClinton verified that Norbert had a felony conviction via the Hinds County dispatch. Norbert was then placed under arrest and Mirandized.

Investigator Lavine's testimony differs in certain ways. He testified that Norbert was walking up to the group as Investigator Lavine asked which among them was "N.O." One of the men sitting on the ground gave a head and eye motion to let him know that Norbert was "N.O." Investigator Lavine states he conducted a brief *Terry* pat of Norbert. Investigator Lavine also said that he began to speak with Norbert about Norbert's accent. They talked about living in Louisiana. Norbert told Investigator Lavine that he had "started to run but then . . . realized there was some more of you all on the other side, so I just turned around." Hr'g Tr. at 37. Investigator Lavine then questioned Norbert about his name and found out then that he was known as "N.O." Investigator Lavine characterized the conversation as "light hearted" and "jovial." Hr'g Tr. at 39.

Investigator Lavine testified that Norbert identified the black Infiniti as his. Then Investigator Lavine walked over to the vehicle on the driver's side. He observed a "weapon kind of wedged down between the seat and the center console . . . [d]own close toward the floor." Hr'g Tr. at 40. Investigator Lavine testified that the deputies asked Norbert if they could search the car. Norbert gave consent, saying that he did not have the keys, but the vehicle was unlocked. Investigator Lavine agreed that Investigator McClinton entered the car and removed the gun.

Investigator Lavine then asked Norbert whose gun it was, and Norbert responded that it was his. Investigator Lavine testified that Norbert did not say anything about his criminal history. However, the background check by the Hinds County Sheriff's Office dispatch indicated that Norbert had a prior felony. The checks were initiated before Investigator Lavine says he found the gun.

Norbert moves to have the gun and his statements suppressed. He argues that his detention in the parking lot of the Millsaps Apartments and the entry into his vehicle without a warrant were not supported by probable cause and violated the Fourth Amendment. Norbert contends that the tip received by the Hinds County Sheriff's Office was insufficient to establish probable cause.

In response, the Government first argues that the Fifth Amendment governs whether Norbert's statements should be suppressed, rather than the Fourth Amendment. The Government claims that Norbert was not in custody when he spoke with law enforcement and therefore his statements should not be suppressed. Further, the Government maintains that though the deputies did not have a warrant to enter Norbert's vehicle and retrieve the gun inside, its discovery and seizure were legally justifiable under the plain view doctrine, as a protective sweep of the area under investigation, and/or the automobile exception to the Fourth Amendment warrant requirement.

The Government also claims the fruit of the poisonous tree doctrine does not apply to nontestimonial evidence found as a result of a voluntary – though not Mirandized – statement, so the gun found on the scene should not be suppressed. Additionally, the Government maintains that Norbert's statements should not be suppressed under the inevitable discovery exception, claiming that "an on-the-scene background check revealed that the Defendant had been convicted of a felony previously."

**LEGAL STANDARD**

Generally, "on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) (citation omitted).

However, warrantless searches are presumptively unreasonable under the Fourth Amendment. *United States v. Wallen*, 388 F.3d 161, 164 (5th Cir. 2004) (citation omitted). "When the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

**DISCUSSION**

As a preliminary note, the Government argues that the Court should determine the admissibility of Norbert's statements under Fifth Amendment jurisprudence concerning custodial interrogation, rather than the Fourth Amendment. In support of this proposition, the Government quotes *United States v. Wright*, where the Fifth Circuit held that for Fifth Amendment protections to attach, "[t]he requisite restraint on freedom is greater than that required in the Fourth Amendment seizure context." 777 F.3d 769, 774 (5th Cir. 2015) (citation omitted).

The argument is misplaced. In *Wright*, the Fifth Circuit did not amend its prior holdings that verbal evidence can be suppressed under the Fourth Amendment. *See United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012) (citing *Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963)). The Fifth Circuit merely explained when Fifth Amendment protections against self-incrimination attach and clarified that the definition of what constitutes "custody" under the Fifth Amendment differs from the Fourth Amendment concept of "a seizure."

Accordingly, the Court will determine if Norbert's Fourth Amendment rights were violated.

**I.   Classification of Norbert's Detention**

The initial step is to classify the detention of Norbert as either: (1) a mere approach by law enforcement, *see Florida v. Royer*, 460 U.S. 491, 497 (1983); (2) an investigatory stop,

6

which would require the deputies to have had reasonable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 31–33 (1968); or (3) a *de facto* arrest, which would require probable cause, *see United States v. Sharpe*, 470 U.S. 675, 685 (1985).

Here, deputies immediately stopped Norbert and those he was with upon the deputies' arrival to the Millsaps Apartments parking lot. The deputies then asked Norbert and the others for identification and patted them down "for officer safety." Norbert and the others were then held by the deputies in that area for at least 15 minutes for questioning and inspection of Norbert's vehicle.

Patting down a person is "a serious intrusion upon the sanctity of the person . . . and it is not to be undertaken lightly." *Terry*, 392 U.S. at 17. Given the pat down and testimony that the deputies held the men for questioning, this is not an example of law enforcement merely approaching someone on the street and "asking him if he is willing to answer some questions," which would not implicate the Fourth Amendment. *Royer*, 460 U.S. at 497. The detention must be characterized, at least initially, as an investigatory stop.

The analysis then turns to whether the investigatory stop became a *de facto* arrest, which would require probable cause.

"In assessing whether a detention is too long in duration to be justified as an investigatory stop . . . it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Conlenzo-Huffman*, 292 F. App'x 361, 364 (5th Cir. 2008) (citing *Sharpe*, 470 U.S. at 686). Evidence that "the officers were dilatory in their investigation" would indicate that the investigative stop became a *de facto* arrest. *Id.* at 364 (citation omitted). Alternatively, evidence that deputies' investigation was "minimally intrusive"

would bolster a finding that the stop was "justifiable on reasonable suspicion." *Id.* (citation omitted).

Here, the deputies' goal was to investigate allegations of illicit drug sales conducted by a particular person, who drove a particular car, and operated the sales in a specific location, as described in the anonymous telephone complaint. The deputies detained Norbert for 15 to 20 minutes. The time was spent asking questions related primarily to the telephone complaint. Based on these facts, it does not appear that the deputies were dilatory in their investigation.

The facts also point to the deputies using "minimally intrusive" means to conduct their investigation. The deputies did not handcuff Norbert or the others, pull out firearms, or engage in any other intrusive means besides the obvious show of force associated with the presence of six to seven deputies.

In sum, the stop should be considered an investigatory stop and not a *de facto* arrest.

## II. Constitutionality of the Investigatory Stop

*Terry v. Ohio* provides a two-part reasonable suspicion inquiry to determine the legality of investigatory stops. 392 U.S. at 19–20. The Court must ask whether the deputies' action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (citation omitted). For the first prong, "[o]nly when the police have a reasonable basis to suspect criminal activity can they justifiably conduct an investigative stop." *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007). As to the second prong, a "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (citation omitted).

Turning to the first prong, the Government does not directly argue that the deputies had reasonable suspicion to conduct the *Terry* stop, despite the issue being raised in the Defendant's Motion. However, when making the argument as to how the telephone complaint established probable cause for the search of the vehicle, the Government highlights "the level of detail of the anonymous tip, the allegation of drug distribution with that vehicle, and law enforcement's ability to corroborate several specific details of the tip at the scene of the crime."

### A. Nature of the Anonymous Tip

"The Supreme Court has evinced a strong distrust of anonymous tips." *Martinez*, 486 F.3d at 862 (citing *Florida v. J. L.*, 529 U.S. 266 (2000)). Only "under appropriate circumstances" can an anonymous tip "demonstrate sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citation omitted). In the Fifth Circuit, a court should consider certain factors to determine if an anonymous tip provided sufficient indicia of reliability. *See United States v. Thompson,* 783 F. App'x 360, 364 (5th Cir. 2019) (citing *Martinez*, 486 F.3d at 861). The factors are:

> (1) the credibility and reliability of the informant;
> (2) the specificity of the information contained in the tip or report;
> (3) the extent to which the information in the tip or report can be verified by officers in the field; and
> (4) whether the tip or report concerns active or recent activity, or has instead gone stale.

*Id.*

"The United States Supreme Court has issued three opinions which guide the inquiry into the reliability of an anonymous tip." *United States v. Booker*, No. 4:16-CR-113, 2016 WL 7471322, at *5 (N.D. Miss. Dec. 28, 2016).

In *Alabama v. White*, law enforcement "received a telephone call from an anonymous person" claiming that a named person would be leaving a location at a particular time, in a particular car, with a particular destination, and that she would be in possession "of about an ounce of cocaine inside a brown attaché case." 496 U.S. 325, 327 (1990). Law enforcement observed the person leave the location identified by the anonymous tip and eventually stopped the individual described in the complaint an hour and 18 minutes after the call. After receiving consent to search the car, the officers discovered cocaine. *Id.* The Supreme Court called it a "close case" but concluded that "under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop." *Id.* at 332.

In *Florida v. J. L.*, "police received a tip from an unknown caller who said that a young black male, standing at a particular bus stop and wearing a plaid shirt, was carrying a gun." *Martinez*, 486 F.3d at 862 (citing *J. L.*, 529 U.S. at 268). "The police arrived at the stop about six minutes later, identified an individual meeting the description in the tip, searched him, and found a gun in his pocket." *Id.* "A unanimous Supreme Court found that the anonymous tip was insufficient to create reasonable suspicion." *Id.* Moreover, the Supreme Court held that "an anonymous informant's ability to describe a person's appearance and location is insufficient to create a reasonable suspicion of criminal activity." *Id.* The Court explained:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

529 U.S. at 272 (citation omitted).

Finally, in *Navarette*, a police department received an anonymous 911 call claiming that a particular truck had run the caller off the road. 572 U.S. at 395. The caller identified the road and the direction the truck was traveling. *Id.* Officers responded and saw the alleged truck on the road traveling in the direction described in the complaint. *Id.* They followed the truck for about five minutes but did not notice any strange driving behavior. *Id.* Even so, the officers stopped the truck. *Id.* They smelled marijuana during the stop, so they conducted a search which resulted in the discovery of 30 pounds of marijuana. *Id.* at 395–96. The Supreme Court found the stop to be supported by reasonable suspicion, even though officers had not been able to corroborate any semblance of illegal activity (*i.e.*, dangerous driving) during their five-minute observation of the truck. *Id.* at 404. The Supreme Court found persuasive the caller's (1) eyewitness knowledge of the alleged criminal behavior; (2) reporting that was "contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event"; and (3) use of the 911 emergency system. *Id.* at 399–401.

The question is whether the facts in Norbert's case more closely track with *White*, *J. L.*, or *Navarette* such that there was "sufficient indicia of reliability" to justify the investigatory stop. Absent a fact pattern directly analogous to *J. L.*, *Terry* stop cases involving anonymous tips are often described as "close calls." Norbert's case is no exception.

### 1. Credibility and Reliability of the Informant

The Government concedes that the tip was anonymous. There is no evidence that the caller provided a name or phone number such that her "credibility and reliability [could] be determined." *United States v. Gomez*, 623 F.3d 265, 270 (5th Cir. 2010). The deputies also never met the person who called. *Compare United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997). The caller claimed to be in management at the Millsaps Apartments, however, there is no

11

evidence that the deputies attempted to verify this claim or identify who, if anyone, in management had made the call.

Based on these undisputed facts, the anonymous caller in this case was lacking in credibility and reliability. *Gomez*, 623 F.3d at 269. Accordingly, "the Government must establish reasonable suspicion based on the remaining factors." *Id.*

### 2. Specificity

In *United States v. Powell*, a prior informant was later found to have been involved in drug dealing and thus lost reliability as an informant. 732 F.3d 361, 370 (5th Cir. 2013). However, the Fifth Circuit still found his tip credible. *Id.* The informant had told officers that two people were "en route from his house . . . with a large quantity of crack." *Id.* "He further provided a very specific description of the vehicle in which they traveled," including the make, model, and first three letters of the license plate. *Id.* The Fifth Circuit found that the "specificity, predictive value, and recency" of the informant's tip were "sufficiently strong to balance the flaws in [the informant's] personal credibility and reliability." *Id.* at 371.

Here, the information provided in the telephone complaint was also relatively specific. It included a description of Norbert, an alias, a description of his car, and his car tag number. It also gave the location of where the alleged drug sales were occurring.

This factor weighs toward the tip having provided reasonable suspicion for the stop.

### 3. Verification

From their cars, the deputies were able to verify the car and a group of Black men sitting in the parking lot. Though Investigator McClinton could not identify Norbert upon arriving to the parking lot, the Court credits Investigator Lavine's testimony that he could identify Norbert from the complainant's description, since he took the call and presumably would be more likely to

remember the description than McClinton (who was merely briefed about the complaint at the 6:00 PM meeting). However, Investigator Lavine testified that he "did not see any drug transactions taking place."

Though the deputies could identify Norbert as one of the men, his location, and the location of his car, they were not able to verify that he was engaging in drug sales. Since the verifiable information upon the deputies' arrival was only Norbert's appearance, his location, and the location of his car, this factor weights more toward the tip not providing reasonable suspicion to justify the stop, just as in *J. L.* "[A]bsent any corroboration of the illegal activity itself, 'the government [has] no reasonable suspicion that the criminal activity suggested by the informant was afoot.'" *Martinez*, 486 F.3d at 864 (quoting *Roch*, 5 F.3d at 899).

Accordingly, this factor weighs strongly against a finding of reasonable suspicion.

### 4. Recentness

Whether or not a tip has gone stale "is to be determined on the facts of each case." *United States v. Gonzalez*, 190 F.3d 668, 673 (5th Cir. 1990) (quotations and citation omitted). The determination is not "simply a mechanical counting of the time between" the time the tip is received and the time the tip is used." *Id.* Instead, "whether a tip has gone stale depends upon the nature of the tip and the nature of the criminal activity alleged." *Id.*

Here, the tip alleged an ongoing pattern of illicit drug sales. The tip was provided sometime in the morning, but deputies did not arrive until 8:00 PM. The Government suggests that this lag was due to the nature of the investigative team not assembling generally until 6:00 PM each day.

"[T]ips that concern an ongoing pattern of criminal activity may remain viable longer than those predicting criminal activity on a date certain." *Id.* at 673 (citation omitted). In *Powell*,

13

the Fifth Circuit found a tip to be "exceedingly fresh" when the officers initiated a traffic stop "approximately two hours" after the informant's call giving the tip. 732 F.3d at 370–71. The Fifth Circuit has also found a two-month old tip not stale given the surrounding circumstances. *See United States v. Villalobos*, 161 F.3d 285, 291 (5th Cir. 1998). Accordingly, this factor weighs toward the tip having provided reasonable suspicion for the stop.

        5.        Section Conclusion

The factors weighing in favor of the anonymous tip are its specificity and its relative recentness. The factors weighing against are the lack of credibility of the informant and the deputies' inability or unwillingness to corroborate that there was illegal activity happening at the parking lot.

While a close call, the facts of this matter more closely resemble the *J. L.* line of cases than *White* or *Navarette*. The Court is persuaded by the weight given in *Martinez* to the verification factor. Absent corroboration of the illegal activity, the deputies lacked reasonable suspicion to conduct the investigatory stop of Norbert. *Martinez*, 486 F.3d at 864. In essence, deputies received an anonymous call that identified Norbert, his car, and his location, and made the allegation that he was selling drugs. When the deputies arrived, they testified that there was no sign of drug dealing, but they could otherwise corroborate the tip. Unlike in *Navarette*, the anonymous tip did not come through the 911 system – it was not an emergency – and was not a situation of drunk driving, or brandishing a firearm as discussed in *Gomez*. In such cases, forcing officers to look into the caller would result in the "perverse outcome" of requiring "officers to investigate citizens availing themselves of the important service provided by 911 dispatchers before intervening to apprehend individuals suspected of committing open criminal acts." *Gomez*, 623 F.3d at 271. In this case, deputies could and should have done some investigation

prior to conducting the investigatory stop, either in the hours between the complaint and when they assembled or by waiting to see if Norbert appeared to be making drug transactions. The fact that the deputies were only able to corroborate otherwise innocent information, Norbert's identification and whereabouts, "does not provide any basis for executing a *Terry* stop . . . If it did, then *Terry* itself would be a dead letter." *Martinez*, 486 F.3d at 864.

Accordingly, the deputies lacked the reasonable basis required under *Terry's* first prong to conduct an investigatory stop of Norbert. Norbert's detention was an unlawful search and seizure under the Fourth Amendment.

### III. Fruit of the Poisonous Tree

Norbert seeks to have the gun and his statements suppressed. "Under the fruit-of-the-poisonous tree doctrine, 'all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation.'" *Id.* 864 (citing *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998)).

Based on the record, the gun and Norbert's statements were derived solely from the illegal *Terry* stop. It was only when Norbert was stopped that the deputies were able to identify the car as his. The deputies also discovered Norbert's criminal history either from the statements he made during the stop or from their call to dispatch after requesting his identification, neither of which would have occurred absent the unlawful stop. There is also no "break in the chain of events sufficient to refute the inference that the evidence was a product of a Fourth Amendment violation." *Id.* The stop occurred within 20 minutes with no obvious break. Accordingly, Norbert's statements and the gun must be suppressed under the fruit-of-the-poisonous tree doctrine. *Id.*

15

The Government presses that the evidence would have been discovered because "an on-the-scene background check revealed that [Norbert] had been convicted of a felony previously." Investigator Lavine's testimony also raises the possibility that Norbert consented to the search, which could "dissipate the taint" of the unlawful *Terry* stop. *United States v. Montgomery*, 777 F.3d 269, 272 (5th Cir. 2015). Finally, based on the findings of the deputies' on-the-scene investigation, the Government raises that the plain view, automobile, and protective sweep exceptions apply to the search of the car and seizure of the gun.

The Fifth Circuit has outlined three exceptions to the fruit of the poisonous tree doctrine. "Evidence will be admissible despite the exclusionary rule if: (1) it derives from an independent source, (2) it has an attenuated link to the illegally secured evidence, or (3) it inevitably would have been discovered during police investigation without the aid of the illegally obtained evidence." *United States v. Runyan*, 275 F.3d 449, 466 (5th Cir. 2001) (quotations and citation omitted). The Government failed to raise the "independent source" or "attenuation" exceptions, and nothing in the facts demonstrates that they apply. As such, the Court finds that neither exception is applicable in this case.

As to the "inevitable discovery" exception, "evidence that 'would inevitably have been discovered without the aid of the illegally obtained evidence' need not be excluded as the fruit of the poisonous tree." *Hernandez*, 670 F.3d at 623 (citing *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001)). "To satisfy the inevitable discovery exception to suppression, there must have been a reasonable probability that the evidence would have been discovered from an untainted source." *Id.* (citing *Singh*, 261 F.3d at 535). "The Government has the burden of proving 'by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

The Government must also show that it "was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation" and that 'the alternate means of obtaining the evidence [was at least] in existence and, at least to some degree, imminent, if yet unrealized." *Id.* (citation omitted).

Here, the Government has offered no proof that the evidence would have been inevitably obtained absent the unlawful stop. Rather, the Government references its on-the-scene investigation. The findings of the investigation included the criminal background check, finding marijuana (on someone else), and Norbert's statements. The Government makes no argument, however, that any of this evidence would have been found absent the deputies' unlawful *Terry* stop. Accordingly, the Government's argument that the inevitable discovery exception applies is unavailing.

"Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." *Montgomery*, 777 F.3d at 272. Consent is valid if it is "1) voluntary and 2) an independent act of free will." *Id.* at 273 (citation omitted). While Investigator Lavine testified that Norbert gave consent, McClinton – who actually entered the car – testified that he did not remember if consent was given. Norbert argues that he did not consent or otherwise knowingly and voluntarily waived his rights. The Government also failed to argue that the consent exception applied. Given Investigator Lavine and McClinton's conflicting statements as to whether consent was given and Norbert's argument, the Court finds that the Government has not met its burden of proving that Norbert gave his consent. Accordingly, the Court will not consider if the consent exception applies.

Lastly, the Government cites to no legal authority to support the assertion that the plain view, automobile, and protective sweep exceptions overcome the taint of an unlawful *Terry* stop.

Here, the facts are similar to *United States v. Jenson*, in which officers searched a person and found a gun and marijuana after a *Terry* stop was "illegally extended . . . beyond the time when reasonable suspicion expired." 462 F.3d 399, 408 (5th Cir. 2006). The Fifth Circuit held that since the evidence would not have been found but for the unlawful extension, the evidence was the fruit of the poisonous tree and must be suppressed. *Id.* In this case, but for the unlawful *Terry* stop, the deputies would not have discovered the gun, nor would Norbert have made these statements. The deputies came upon the evidence by exploitation of the illegal stop, not "by means sufficiently distinguishable to be purged of the primary taint." *Hernandez*, 670 F.3d at 620 (quoting *Wong Sun*, 371 U.S. at 488). As such, the gun and Norbert's statements, as the fruit of an unlawful *Terry* stop, must be suppressed. *Jenson*, 462 F.3d at 408.

## CONCLUSION

Norbert's Motion to Suppress is **GRANTED.** This matter is set for trial during the March 2020 term of court with its pretrial conference set for 9:00 a.m., February 21, 2020.

**SO ORDERED**, this the 13th day of January, 2020.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE
